1   Allan D. NewDelman, Esq, (004066)
2   Roberta J. Sunkin, Esq. (011993)
    ALLAN D. NEWDELMAN, P.C.
3   80 East Columbus Avenue
    Phoenix, Arizona 85012
4   Telephone: (602) 264-4550
    Email: anewdelman@adnlaw.net
5   Attorney for Debtor/Plaintiff

6

7               UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF ARIZONA

8   In re               )  In Proceeding Under
                        )  Chapter Eleven
9   PETER J. WORKUM,      )
                        )  Case No. 2-12-bk-08554 BKM
10                     )
11                     )
                        )  Adv. No 2-14-ap-639
12                     )
            Debtor.       )
13   _____)
                        )  COMPLAINT TO DETERMINE THE
14                     )  VALIDITY, PRIORITY OR EXTENT
    PETER J. WORKUM,      )  OF A LIEN OR OTHER INTEREST
15                     )  IN PROPERTY
           Plaintiff,      )
16                     )  (RE: 5728 North Harding Drive,
17   v.                   )  Paradise Valley, AZ, 85253)
                    )
18   PNC MORTGAGE, a division of PNC  )
    BANK, N.A. fka NATIONAL CITY   )
19   MORTGAGE, a national association; RCS )
20   RECOVERY SERVICES, LLC, a Florida  )
    limited liability company; SPECIAL   )
21   PURPOSE CAPITAL, LLC, an Arizona  )
    limited liability company; 3502 LENDING, )
22   LLC, an Arizona limited liability company; )
23   638 LAKE PURGATORY, LLC, an    )
    Arizona limited liability company; GLENN )
24   MARTIN OLNICK; and JOHN R.    )
    KUTZSCHAN,            )
25                     )
26            Defendants.     )
    _____)
27

28   Workum 506 Complaint          1

1    NOW COMES the Plaintiff, Peter J. Workum, by and through counsel, and hereby states

2    for his Complaint as follows:

3                    **ALLEGATIONS COMMON TO ALL COUNTS**

4
                                        1.
5

6        This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; 28 U.S.C. §

7    2201(a); 11 U.S.C. §§ 506(a),  547(b) and 522(f), and Rule 7001 et seq. Rules of Bankruptcy

8    Procedure  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B), 157(b)(2)(I) and

9
     157(b)(2)(K).
10
                                        2.
11

12        Plaintiff resides in Maricopa County, Arizona and is the Debtor in the above captioned

13   Chapter Eleven proceeding, having filed for bankruptcy relief on April 23, 2012.

14
                                        3.
15

16        Defendant, PNC Mortgage, a division of PNC Bank, N.A., fka National City Mortgage,

17   a national association its successor or assign, upon information and belief, is licensed to write,

18   service and make residential mortgage loans in the State of Arizona.

19
                                        4.
20

21        Defendant, RCS Recovery Services, LLC, its successor or assign, upon information and

22   belief, is licensed to write, service and make residential mortgage loans in the State of Arizona.

23                                       5.

24        Defendant, Special Purpose Capital, LLC, upon information and belief, is an Arizona

25   limited liability company licensed to do business in the State of Arizona.

26

27

28   Workum 506 Complaint                          2

6.

Defendant, 3502 Lending LLC, upon information and belief is an Arizona limited liability company licensed to do business in the State of Arizona.

7.

Defendant, 638 Lake Purgatory, LLC, upon information and belief is an Arizona limited liability company licensed to do business in the State of Arizona.

8.

Defendant Glenn Martin Olnick, is an individual, who, upon information and belief, may reside within the State of Arizona.

9.

Defendant John R. Kutzschan, is an individual, who, upon information and belief, may reside within the State of Arizona.

10

Plaintiff, at the time of the filing of bankruptcy, was the titled owner to certain real property located at 5728 North Harding Drive, Paradise Valley, Arizona, 85253 (the "Property") with a legal description as set forth below:

LOT 10, VIEWLAND, ACCORDING TO BOOK 106 OF MAPS, PAGE 48, RECORDS OF MARICOPA COUNTY, ARIZONA.

Parcel ID 107-03-046

This Property is the Debtor's residence and is subject to an allowed homestead exemption.

11

The Plaintiff believes that the Property is worth no more than $1,200,000.00 based on a appraisal with an effective date of August 10, 2013. A copy of the appraisal is attached hereto

Workum 506 Complaint                                    3

as Exhibit "A".

12.

The Property is subject to a first position Deed of Trust in favor of Washington Mutual Bank, FA and subsequently assigned to DLJ Mortgage Capital, Inc., its successors or assigns, with said Deed of Trust having been recorded on March 28, 2006 in the Maricopa County Recorder's Office under Instrument Number 20060410446.

13.

First position Deed of Trust lien holder, DLJ Mortgage Capital, Inc ("DLJ"), through its servicer, Select Portfolio Servicing, Inc ("SPS"), has filed a Proof of Claim (Claim Number 5) stating that the balance due under the promissory note secured by that first position Deed of Trust is no less than $2,214,228.88.

## **COUNT ONE**
(Against Defendant PNC Mortgage and RCS Recovery Services, LLC.)

14.

Upon information and belief, Defendant PNC Mortgage, a division of PNC Bank, N.A., fka National City Mortgage, a national association, ("PNC") purports to hold a recorded second position Deed of Trust against the property by virtue of a Deed of Trust recorded on May 12, 2006 at Instrument Number, 2006-0647766 Records of Maricopa County, Arizona. On or about May 1, 2012, the loan may have been sold/transferred to Defendant RCS Recovery Services, LLC ("RCS").

15.

Neither Defendant PNC nor Defendant RCS has filed a Proof of Claim relative to the second position Deed of Trust however, upon information and belief, the amount owed to one of these Defendants and/or their assigns is in excess of $200,000.00.

Workum 506 Complaint

4

16.

Plaintiff asserts that after applying the first mortgage lien of DLJ, there is no equity remaining to which the lien of Defendant PNC and/or RCS and/or their assigns may attach. As a result, pursuant to 11 U.S.C. §§506(a)(1) and 506(d) Defendants hold a wholly unsecured Deed of Trust against the property and is therefore not secured and its lien is void.

### COUNT TWO
(Against Special Purpose Capital, LLC)

17.

Plaintiff realleges and incorporates herein all other allegations as set forth in Paragraphs 1 through 16.

18.

The Property is subject to a third position Deed of Trust in favor of Special Purpose Capital, LLC which was recorded on May 12, 2006 with the Maricopa County Recorder's Office at Instrument Number 2006-0647768.

19.

The Property is subject to a fifth position Deed of Trust in favor of Special Purpose Capital, LLC which was recorded on March 27, 2012 with the Maricopa County Recorder's Office at Instrument Number 2012-023322.

20.

Defendant Special Purpose Capital, LLC has failed to file a Proof of Claim relative to the third and fifth position Deed of Trust however, upon information and belief, the amount owed for the third position Deed of Trust is in excess of $500,000.00 and the amount owed for the fifth position Deed of Trust is in excess of $676,000.00.

Workum 506 Complaint                                  5

21.

Plaintiff asserts that after applying the first mortgage lien of DLJ, there is no equity remaining to which either lien of Defendant Special Purpose Capital, LLC may attach. As a result, pursuant to 11 U.S.C. §§506(a)(1) and 506(d) Defendant holds wholly unsecured Deeds of Trust against the property and is therefore not secured and both its third and fifth position liens are void.

**COUNT THREE**
(Against Defendant 3502 Lending, LLC)

22.

Plaintiff realleges and incorporates herein all other allegations as set forth in Paragraphs 1 through 21 .

23.

The Property is subject to a fourth position Deed of Trust in favor of 3502 Lending, LLC which was recorded on February 17, 2010 with the Maricopa County Recorder's Office at Instrument Number 2010-0130123.

24.

Defendant, 3502 Lending, LLC has failed to file a Proof of Claim relative to the fourth position Deed of Trust however, upon information and belief, the amount owed for the fourth position Deed of Trust is in excess of $37,000.00.

25.

Plaintiff asserts that after applying the first mortgage lien of DLJ, there is no equity remaining to which Defendant, 3502 Lending, LLC's fourth position Deed of Trust may attach. As a result, pursuant to 11 U.S.C. §§506(a)(1) and 506(d) Defendant holds a wholly unsecured

Workum 506 Complaint                                    6

1    fourth position Deed of Trust against the property and is therefore not secured and its lien is void.

## COUNT FOUR
### (Against Defendant 638 Lake Purgatory, LLC)

26.

Plaintiff realleges and incorporates herein all other allegations as set forth in Paragraphs 1 through 25.

27.

The Property is subject to a sixth position Deed of Trust in favor of 638 Lake Purgatory, LLC which was recorded on January 13, 2011 with the Maricopa County Recorder's Office at Instrument Number 2011-0037557.

28.

Defendant, 638 Lake Purgatory, LLC has failed to file a Proof of Claim relative to the sixth position Deed of Trust however, upon information and belief, the amount owed for the sixth position Deed of Trust is in excess of $37,000.00.

29.

Plaintiff asserts that after applying the first mortgage lien of DLJ, there is no equity remaining to which Defendant, 638 Lake Purgatory, LLC's sixth position Deed of Trust may attach. As a result, pursuant to 11 U.S.C. §§506(a)(1) and 506(d) Defendant holds a wholly unsecured sixth position Deed of Trust against the property and is therefore not secured and its lien is void.

///

///

## COUNT FIVE
### (Against Glenn Martin Olnick and John R. Kutzschan)

30.

Plaintiff realleges and incorporates herein all other allegations as set forth in Paragraphs 1 through 29.

31.

Upon information and belief, the Property is subject to a Judgment Lien in favor of Defendants Glenn Martin Olnick and John R. Kutzschan, recorded on September 17, 2007 at the Maricopa County Recorder's Office under Instrument Number 20071027585.

32.

Plaintiff asserts that the judgment lien, does not attach to the Property due to the allowed homestead exemption or, if it is a lien against the Property, after applying the first Deed of Trust there is no equity remaining for which the Defendants' Judgment Lien may attach. As a result, pursuant to 11 U.S.C. § 547, 11 U.S.C. §§506(a)(1) and 506(d) and 11 U.S.C. §522(f) Defendants Glenn Martin Olnick and John R. Kutzschan hold a wholly unsecured claim and the recorded Judgment Lien is void as against the Property.

**WHEREFORE,** Plaintiff prays that this Honorable Court find in favor of the Plaintiff and Order the following:

    a.    That, for the purposes of this Adversary Proceeding, the value of the Plaintiff's homestead residence is $1,200,000.00;

    b.    That, as it relates to the second position Deed of Trust, Defendants PNC Mortgage and/or RCS Recovery Services, LLC and/or their assigns, is

Workum 506 Complaint

8

1  totally unsecured with said lien being void;

2  c.  That, as it relates to the third and fifth position Deeds of Trust, Defendant

3     Special Purpose Capital, LLC is totally unsecured with said liens being

4     void;

5

6  d.  That, as it relates to the fourth position Deed of Trust, Defendant, 3502

7     Lending, LLC, is totally unsecured with said lien being void;

8  e.  That, as it relates to the sixth position Deed of Trust, Defendant 638 Lake

9     Purgatory, LLC is totally unsecured with said lien being void;

10

11  f.  That, as it relates to the Judgment Lien, recorded in Maricopa County, in

12     favor of Defendants Glenn Martin Olnick and John R. Kutzschan, there

13     is insufficient equity in the Property to support such lien based upon the

14     value of the property, the balance owed on the first position deed of trust

15     and the allowed homestead exemption, therefore such lien is void with

16     said creditors holding a totally unsecured claim;

17

18  g.  That the Order of this Court may be recorded and the same shall have the

19     effect of voiding the liens on the public records to the extent that the

20     Defendants' claims are wholly unsecured upon the entry of an Order

21     confirming the Debtor's Third Amended Chapter 11 Plan of

22     Reorganization; and

23

24  h.  That Plaintiff recovers any additional relief that this Court deems justified

25     and appropriate.

26  ///

27

28  Workum 506 Complaint                    9

RESPECTFULLY SUBMITTED, this __31__ day of __July__, 2014.

ALLAN D. NEWDELMAN, P.C.

/s/ RJS 011993

Roberta J. Sunkin, Esq.
Counsel for the Debtor/Plaintiff

Workum 506 Complaint                    10

# EXHIBIT "A"

| | |
|---|---|
| **SUBJECT** | |

| Neighborhood Name | SW Paradise Valley/Phoenix Biltmore | Map Reference | p126lq168 | Census Tract | 1051.03 |
|---|---|---|---|---|---|

Occupant ☒ Owner ☐ Tenant ☐ Vacant  Special Assessments $ 0  ☐ PUD  HOA $ 0  ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Estimate market value

Lender/Client Workum  Address 5728 N Harding Dr Paradise Valley AZ 85253

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s). MLS/PR Subject has not been listed in MLS. No prior improved sales were noted in the past three years. Numerous prior recordings were however noted. None of these appear to be sales.

**CONTRACT**

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $  Date of Contract  Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☒ Urban | ☐ Suburban | ☐ Rural | Property Values ☐ Increasing | ☒ Stable | ☐ Declining | PRICE | | One-Unit | 85 % |
| Built-Up ☒ Over 75% | ☐ 25-75% | ☐ Under 25% | Demand/Supply ☐ Shortage | ☒ In Balance | ☐ Over Supply | $ (000) | (yrs) | 2-4 Unit | % |
| Growth ☐ Rapid | ☒ Stable | ☐ Slow | Marketing Time ☐ Under 3 mths | ☒ 3-6 mths | ☐ Over 6 mths | 650 Low | 0 | Multi-Family | 5 % |
| Neighborhood Boundaries | The neighborhood is roughly bound by Northern Ave. (Alignment) on the | | | | | 2,500 High | 65 | Commercial | 5 % |
| north, Tatum Bl. on the east, Camelback Rd. on the south, and 24th St. on the east. | | | | | | 1,200 Pred. | 30 | Other | 5 % |

Neighborhood Description Subject is in the extreme SW corner of the Town of Paradise Valley AZ. It is within several blocks of the City of Phoenix on three sides. The area has very good access to all normal amenities and the Camelback corridor. No adverse neighborhood conditions were noted. The 5%+ land use noted above is vacant land most of which is suitable for development.

Market Conditions (including support for the above conclusions) Market conditions in this market are stable after several years of declining values. Current interest rates are in the 3.5% to 5.0% range and stable. Non conforming properties might be required to pay higher interest rates. Please refer to Market Conditions addenda.

**SITE**

Dimensions See plat reductions  Area 1.14 ac  Shape Triangular  View B;Mtn;

Specific Zoning Classification R-43 Residential  Zoning Description Residential zoning at a specific minimum density.

Zoning Compliance ☐ Legal ☒ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | | ☒ Septic Tank | Alley None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No FEMA Flood Zone X  FEMA Map # 04013C1670G  FEMA Map Date 09/30/2005

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☒ Yes ☐ No If Yes, describe

Subject is a non-conforming site. There are numerous setback violations. (See addenda) Per the Town zoning ordinance, subject cannot be expanded in any way. The shape of the site renders the southern portion of the site useless for improvements. Subject has light traffic influence on two sides and suffers a loss of privacy. Subject has panoramic Mt. views visible from the rooftop deck.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One | ☐ One with Accessory Unit | ☒ Concrete Slab | ☐ Crawl Space | Foundation Walls | Concrete/avg. | Floors | Crpt/tile/wood/good |
| # of Stories 1 | | ☐ Full Basement | ☐ Partial Basement | Exterior Walls | Frm/Stuc/Blk/avg. | Walls | Drywall/good |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area | 0 sq.ft. | Roof Surface | BU/Foam/avg. | Trim/Finish | Wooden/good |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish | 0 % | Gutters & Downspouts | Downspouts/good | Bath Floor | Tile/good |
| Design (Style) Contemporary | | ☐ Outside Entry/Exit | ☐ Sump Pump | Window Type | Alum./good | Bath Wainscot | Tile/good |
| Year Built 1969 | | Evidence of ☐ Infestation | None noted | Storm Sash/Insulated | None | Car Storage | ☐ None |
| Effective Age (Yrs) 15 | | ☐ Dampness | ☐ Settlement | Screens | Screens/good | ☒ Driveway | # of Cars 8 |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities | Woodstove(s) # 0 | Driveway Surface | Pavers |
| ☐ Drop Stair ☐ Stairs | | ☐ Other | Fuel Gas | ☒ Fireplace(s) # 3 | ☒ Fence Block | ☒ Garage | # of Cars 4 |
| ☐ Floor ☒ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck Patio | ☒ Porch Entry | ☐ Carport | # of Cars 0 |
| ☐ Finished ☐ Heated | | ☐ Individual | ☐ Other | ☒ Pool Yes | ☐ Other | ☒ Att. ☐ Det. ☐ Built-in | |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains: 12 Rooms 4 Bedrooms 4.5 Bath(s) 4,884 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). Multi-car garage, fencing, kitchen island, covered patio, walk-in closet, custom countertops.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). C3;Kitchen-remodeled-eleven to fifteen years ago;Bathrooms-remodeled-eleven to fifteen years ago;Subject is a good quality single family residence that is in good physical condition. Tax records indicate original construction in 1969. The owner believes that remodeling and expansions were done circa 1999 and 2004. Physical depreciation was based on the effective age. See comments regarding remodeling of the comparables.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☒ Yes ☐ No If Yes, describe

It is unknown whether the portions of the residence added over time comply with building codes or were engineered/designed to comply with same.

| | SUBJECT | COMPARABLE SALE #1 | +(-) $ Adjustment | COMPARABLE SALE #2 | +(-) $ Adjustment | COMPARABLE SALE #3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Proximity to Subject | | 1.69 miles NE | | 0.35 miles NW | | 1.64 miles E | |
| Sale Price | $ | $ 1,300,000 | | $ 1,450,000 | | $ 1,575,000 | |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 297.89 sq.ft. | | $ 187.12 sq.ft. | | $ 295.33 sq.ft. | |
| Data Source(s) | | MLS#4869002;DOM 84 | | MLS#4766925;DOM 304 | | MLS#4822996;DOM 150 | |
| Verification Source(s) | | Bldr/PR 13-319363 | | PR 13-440534 | | MLS/PR/13-163102 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | ArmLth Conv;0 | | ArmLth Conv;0 | | ArmLth Cash;0 | |
| Date of Sale/Time | | s04/13;c02/13 | | s05/13;c04/13 | | s02/13;c02/13 | |
| Location | B;Res; | B;Res; | | B;Res; | | B;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 1.14 ac | 42,253 sf | 0 | 1.22 ac | 0 | 37,026 sf | 0 |
| View | B;Mtn; | B;Panoramic Cb| | -150,000 | B;Mttop/Traffic; | 0 | B;Camelback/Tr| | -200,000 |
| Design (Style) | Contemporary | Contemporary | | Contemporary | | Contemporary | |
| Quality of Construction | Q3 | Q3 | | Q3 | | Q3 | |
| Actual Age | 44 | 46 | 0 | 33 | 0 | 32 | 0 |
| Condition | C3 | C3 | | C3 | | C3 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 12  4  4.5 | 12  5  3.5 | +10,000 | 14  4  6.5 | -20,000 | 12  4  3.5 | +10,000 |
| Gross Living Area | 4,884 sq.ft. | 4,364 sq.ft. | +62,400 | 7,749 sq.ft. | -343,800 | 5,333 sq.ft. | -53,900 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Avg. | Good | -50,000 | Avg. | | Good | -50,000 |
| Heating/Cooling | Central | Central | | Central | | Central | |
| Energy Efficient Items | Good | Good | | Good | | Good | |
| Garage/Carport | Garage-4 | Garage-2 | +30,000 | Garage-3 | +15,000 | Garage-4 | |
| Porch/Patio/Deck | Cov. Ent./Patio | Cov. Ent./Patio | | Cov. Ent./Patio | | Cov. Ent./Patio | |
| Upgrades | See addenda | Similar | 0 | Similar | | Superior | -75,000 |
| Fireplace | 3 | 3 | | 3 | | 2 | +2,000 |
| Swimming Pool/Landscape | Pool/Custom | Pool/Custom | | Pool/Custom | | Pool/Custom | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -97,600 | ☐ + ☒ - | $ -348,800 | ☐ + ☒ - | $ -366,900 |
| Adjusted Sale Price of Comparables | | Net Adj. 7.5% Gross Adj. 23.3% | $ 1,202,400 | Net Adj. 24.1% Gross Adj. 26.1% | $ 1,101,200 | Net Adj. 23.3% Gross Adj. 24.8% | $ 1,208,100 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

r

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   Public Records
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   Public Records
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | PR | PR | PR | PR |
| Effective Date of Data Source(s) | 09/13/2013 | 09/13/2013 | 09/13/2013 | 09/13/2013 |

Analysis of prior sale or transfer history of the subject property and comparable sales    Subject has no recent improved sales history. One of the comparables

above showed a prior transfer in a meaningful time frame.

Summary of Sales Comparison Approach    Many other sales were cited in subjects area. Change orders and especially remodeling  can be a
significant portion of value in this market segment. Adjustment was applied to several sales to reflect the difference. This adjustment was not
applied on a dollar for dollar basis, but attempted to reflect market value differences.
Additional sales were considered, see addenda.

Indicated Value by Sales Comparison Approach $    1,200,000

| Indicated Value by: Sales Comparison Approach $ 1,200,000 | Cost Approach (if developed) $ 1,257,807 | Income Approach (if developed) $ |
|---|---|---|

The greatest emphasis was given to direct sales comparison which best reflects the actions of buyers and sellers. The income analysis
is not applicable. This report is intended to conform to the USPAP definition of a Summary Report. It is intended for use only by the named
client as stated on page 3.
This appraisal is made ☐ "as is",  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed,  ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair. There is insufficient data for an

requirements. A strong odor was smelled near the system. It cannot be determined if the septic system was expanded as the home was expanded over time to support the current bedroom/fixture count.

Third parties may not rely on this report. The intended user of this appraisal is the named client only. The intended use is to establish market value as of the effective date.

No special incentives were given to obtain this assignment. The appraiser has not appraised subject in the past. The property was visited in January 2013 when asked by the owner to consider a review or to perform a fact check on a prior appraisal. The owner was advised of numerous factual errors in this report and no appraisal review was performed. We did not concur with, nor did we dispute that valuation.

ADDITIONAL COMMENTS

The photo of one sale (#4) was from the internet. The appraiser could not get through the security gate.

All sales had virtual tours. Adjustments beyond normal underwriting guidelines were, in some cases, necessary and unavoidable. This is in part, due to the wide price range in the area, the variance in size, amenities, and site values. More closely matching current sales are not available.

Due to the setback violations, it is unlikely that subject could be rebuilt as is in case of fire or other damage. It is likely that subject could not qualify for typical financing in this market sector. It is probable that a higher interest rate would be charged due to the nonconformity.

The valuation is subject to several specific conditions. First, it is assumed that the survey provided accurately depicts the numerous setback violations of the residence and the septic system. Secondly, it is assumed that subjects multiple additions and renovations were legally permitted and complied with building and safety codes in force at the respective times. Third, it is assumed that the existing septic system is adequate and compliant. A septic system inspection is strongly recommended however, such an inspection might put the owner at risk if the system is noncompliant.

Subject was originally built in 1969 and per owner was expanded and remodeled in 1999 and 2004.

Sale 1 was originally built in 1967 and remodeled in 2003 per MLS. Sale 2 was built in 1980 and a new roof was installed in 2010. Sale 3 was built in 1981 and was remodeled in 2008 and 2010. Sale 4 was built in 1986 with no recent remodeling. Sale 5 was built in 1975 and no updating was specified in MLS. The virtual tour however indicates extensive remodeling and many components that are similar to subjects. Subjects marketability can only be rated as fair but several factors cannot be proved with certainty. At the time when the property is sold it will be necessary to disclose the setback violations and to answer whether the additions to subjects original residence were completed with a building permit. It is possible that at least one expansion was completed under an old Paradise Valley building code which allowed for expansion if a certain portion was left standing. We cannot answer the question at this time. Any potential buyer would likely require a building and septic tank inspection. Lastly it is possible that subject may not be able to qualify for conforming financing. Although some properties in this market segment are sold for cash, the lack of normal financing would require a higher interest rate. This impacts the marketability and possibly the value. The appraiser considered further discounting but applied no adjustments for these conditions since support or lack thereof for such adjustments could not be adequately supported with market data.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)  A separate land appraisal was not requested and is beyond the scope of this report. Sites like subject in planned communities are not normally sold to individuals.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | | | | OPINION OF SITE VALUE | | | | =$ | 475,000 |
|---|---|---|---|---|---|---|---|---|---|
| Source of cost data  Marshall Swift/Appraisers files | | | | DWELLING | 4,884 Sq.Ft. @ $ | 190.00 | | =$ | 927,960 |
| Quality rating from cost service  Good  Effective date of cost data  Current | | | | | 0 Sq.Ft. @ $ | | | =$ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | Swimming Pool | | | | =$ | 45,000 |
| The cost factors are based on national cost services and actual local | | | | Garage/Carport | 1,233 Sq.Ft. @ $ | 52.00 | | =$ | 64,116 |
| costs compiled by the appraiser. | | | | Total Estimate of Cost-New | | | | =$ | 1,037,076 |
| These were obtained from local builders and cost sheets on | | | | Less | Physical | Functional | External | | |
| numerous proposed appraisal assignments. | | | | Depreciation | 259,269 | 70,000 | | =$( | 329,269) |
| Subjects estimated value, in relation to the areas predominant | | | | Depreciated Cost of Improvements | | | | =$ | 707,807 |
| value, does not have an effect on marketability. | | | | "As-is" Value of Site Improvements | | | | =$ | 75,000 |
| Estimated Remaining Economic Life (HUD and VA only) | | 45 Years | | INDICATED VALUE BY COST APPROACH | | | | =$ | 1,257,807 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
|---|---|---|---|
| Summary of Income Approach (including support for market rent and GRM) | | | |

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No  Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility

report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**     The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Callan Appraisal Inc. | |
| Signature | Signature |
| Name   John T. Callan | Name |
| Company Name   Callan Appraisal Inc. | Company Name |
| Company Address   13630 N Woodside Dr | Company Address |
| Fountain Hills AZ 85268 | |
| Telephone Number   602 319-8905 | Telephone Number |
| Email Address   jcallan1561@earthlink.net | Email Address |
| Date of Signature and Report   10/01/2013 | Date of Signature |
| Effective Date of Appraisal   08/10/2013 | State Certification # |
| State Certification # | or State License # |
| or State License #   Cert. General #30352 | State |
| or Other (describe)   State # | Expiration Date of Certification or License |
| State   AZ | |
| Expiration Date of Certification or License   08/31/2014 | **SUBJECT PROPERTY** |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 5728 N Harding Dr | Date of Inspection |
| Paradise Valley, AZ 85253 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $   1,200,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name   No AMC | |
| Company Name   Workum | COMPARABLE SALES |

Case 2:14-ap-00639-BKM   Doc 1   Filed 07/31/14   Entered 07/31/14 07:48:24   Desc
Main Document    Page 18 of 32

| | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sale Price/Gross Liv. Area | $          sq.ft. | $   233.49   sq.ft. | | $   316.84   sq.ft. | | $          sq.ft. | |
| Data Source(s) | | MLS#4875238;DOM 133 | | MLS#4907313;DOM 50 | | | |
| Verification Source(s) | | MLS/PR/13-169081 | | MLS/PR/13-516758 | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | | |
| Concessions | | Conv;0 | | Conv;0 | | | |
| Date of Sale/Time | | s02/13;c01/13 | | s06/13;c04/13 | | | |
| Location | B;Res; | B;Res; | | B;Res; | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 1.14 ac | 43,124 sf | 0 | 1.72 ac | -200,000 | | |
| View | B;Mtn; | B;Mtn; | | B;Mtn; | | | |
| Design (Style) | Contemporary | Contemporary | | Contemporary | | | |
| Quality of Construction | Q3 | Q2 | -70,000 | Q3 | | | |
| Actual Age | 44 | 27 | 0 | 38 | 0 | | |
| Condition | C3 | C3 | | C3 | | | |
| Above Grade | Total / Bdrms. / Baths | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | | Total / Bdrms. / Baths | |
| Room Count | 12 / 4 / 4.5 | 14 / 5 / 4.0 | +5,000 | 11 / 3 / 3.0 | +15,000 | / / | |
| Gross Living Area | 4,884 sq.ft. | 5,996 sq.ft. | -133,400 | 4,103 sq.ft. | +93,700 | sq.ft. | |
| Basement & Finished | 0sf | 0sf | | 0sf | | | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Avg. | Good | -50,000 | Good | -50,000 | | |
| Heating/Cooling | Central | Central | | Central | | | |
| Energy Efficient Items | Good | Good | | Good | | | |
| Garage/Carport | Garage-4 | Garage-3 | +15,000 | Garage-3 | +15,000 | | |
| Porch/Patio/Deck | Cov. Ent./Patio | Cov. Ent./Patio | | Cov. Ent./Patio | | | |
| Upgrades | See addenda | Similar | 0 | Similar | 0 | | |
| Fireplace | 3 | 3 | | 3 | | | |
| Swimming Pool/Landscape | Pool/Custom | Pool/Custom | | Pool/Custom | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $   -233,400 | ☐ + ☒ - | $   -126,300 | ☐ + ☐ - | $ |
| Adjusted Sale Price | | Net Adj.   16.7 % | | Net Adj.   9.7 % | | Net Adj.   % | |
| of Comparables | | Gross Adj.   19.5 % | $ 1,166,600 | Gross Adj.   28.7 % | $ 1,173,700 | Gross Adj.   % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | PR | PR | PR | |
| Effective Date of Data Source(s) | 09/13/2013 | 09/13/2013 | 09/13/2013 | |

Analysis of prior sale or transfer history of the subject property and comparable sales   Comp.4 had a 12/2012 recording that appears to be a foreclosure or conveyance to a bank.

Analysis/Comments   A small functional adjustment was applied to 4 sales. This was for the utility of the site. Subject had a large portion of the site that could not be improved further due to the setback violations. Sale 2 also had a large portion that could not be improved further due to the slope of the site to the south.

Subjects valuation is complex for numerous reasons. Because of this, added comments are necessary. Herein we will discuss some of the comparables considered but not cited and the specific reasons these were not used in the valuation.

1) 5749 N Canyon Dr sold in 5/13 for $1,100,000. It is similar in size and quality to subject. It was designed by a noted architect, Bill Bruder. We appraised this home in 1986/87. The interior architecture is so unique that it is difficult to assign either a positive or negative value to many features. This sale would indicate a lower value.

2) 5900 N Homestead Lane sold in 6/13 for $1,375,000 per MLS. No affidavit of value was found in the tax records and the terms were shown as "private sale". The site was 1.96 acres of flat usable land and a mortgage of $5,000,000 was indicated.      The indicated mortgage amount could be related to a foreclosure. This sale would indicate a lower value.

3) 4430 E Arlington Rd sold in 5/13 for $1,125,000. The seller of this home is the buyer of the following home. This sale would indicate a higher value.

4) 3311 E Palo Verde Dr sold in 5/13 for $1,800,000. The buyer is a prominent real estate attorney. This home was listed and sold on the same day. Besides zero days on market, the listing agent published only 1 photo of the property in MLS. These two facts indicated that the sale was not arms length. We could not confirm or deny this. The property certainly was not exposed to the open market in a normal fashion.

5) 6001 N 38th Place sold in 3/13 for $700,000. A large difference in livable area was noted between that indicated by the agent and the figure in the tax records.

6) The property across the street is listed for $1,629,000. It was listed on 06/20/2013. This property was last purchased in 11/05 for $1,925,000 The seller at that time was an investor. It is difficult to establish how much the current asking price should be discounted.

Numerous sales of vacant sites were also researched and considered. Included were several to the south of subject that are being redeveloped.



Sketch by Apex IV™

Comments: **FIGURES AND MEASUREMENTS ARE APPROXIMATE.**

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | Main Living Area | 4129.26 | |
| | Guest House | 754.26 | 4883.52 |
| P/P | GH Cvd Patio | 256.00 | |
| | Cvd Patio/Obs Deck | 212.80 | 468.80 |
| GAR | 3-Car Garage | 870.74 | |
| | 1-Car Garage | 361.90 | 1232.64 |
| OTH | Storage Garage | 137.76 | 137.76 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| Main Living Area | | |
| 3.3 x | 11.7 | 38.61 |
| 12.3 x | 29.7 | 365.31 |
| 11.2 x | 19.1 | 213.92 |
| 15.4 x | 25.0 | 385.00 |
| 15.8 x | 20.9 | 330.22 |
| 22.2 x | 28.7 | 637.14 |
| 9.2 x | 25.3 | 232.76 |
| 6.1 x | 18.7 | 114.07 |
| 12.7 x | 20.8 | 264.16 |
| 8.3 x | 12.6 | 104.58 |
| 32.9 x | 39.8 | 1309.42 |
| 4.1 x | 19.5 | 79.95 |
| 2.2 x | 24.6 | 54.12 |
| Guest House | | |
| 20.6 x | 21.9 | 451.14 |
| 3 unlisted calculations | | 303.12 |



# PETER WORKUM RESIDENCE
## 5728 N. HARDING DRIVE
## PARADISE VALLEY, ARIZONA

## LEGAL DESCRIPTION

Lot 10 of WEMLAND as recorded in Book 106 of Maps, page 46, records of Maricopa County, Arizona.

Assessor Parcel No. 170-03-045

Containing 1.1368 acres.

## BENCH MARK

Stone in handhole at the intersection of Stanford Drive and 36th Street (Palo Cristi Road).

Elevation = 1259.44 feet (Town of Paradise Valley Datum)

## CERTIFICATION

To U.S. Title Agency, LLC, Consolidated Diversified Holdings, LLP. and Peter Workum:

This is to certify that this map or plat and the survey on which it is based were made in accordance with the 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys, jointly established and adopted by ALTA and NSPS, and includes Items 1, 3, 4, 5, 6(a), 8, 9, 11(c), and 14 from Table A thereof. The field work was completed on November 23, 2004.

Thomas L. Rope, R.L.S. No. 21081

## NOTES

1. This survey was based upon a Condition of Title Report prepared by U.S. Title Agency, LLC, File No. 00001240-099-TSC dated March 23, 2012.

2. This property subject to the following Schedule B Exceptions:

a. Reservations or exceptions contained in Patents or in Acts authorizing the issuance thereof.
b. All matters as shown of the plat of said subdivision.
c. Restrictions, conditions, covenants and reservations per Docket 1143, page 505 and Docket 5293, page 310.

3. © Copyright 2012. These drawings are an instrument of service and are the property of Land Survey Services. No reproduction or use of design concepts are allowed without written permission of Land Survey Services. Any violation of this copyright shall be subject to legal action.



**COMPARABLE No. 1**
7015 N Hillside Dr
1.69 miles NE

**COMPARABLE No. 4**
6300 N 42nd St
1.08 miles NE

**SUBJECT**
5728 N Harding Dr

**COMPARABLE No. 2**
3270 E Palo Verde Dr
0.35 miles NW

**COMPARABLE No. 3**
4761 E Marston Dr
1.64 miles E

**COMPARABLE No. 5**
3700 E Camino Sin Nombre
0.29 miles E







**Prepared for:**
Callan Appraisal, Inc.

5728 N Harding Dr
Paradise Valley, AZ 85253-5012



**FLOODSCAPE**

**Flood Hazards Map**

**Map Number**
04013C1670G

**Effective Date**
September 30, 2005

Powered by FloodSource
877.77.FLOOD
www.floodsource.com

© 1999-2013 SourceProse and/or FloodSource Corporations. All rights reserved. Patents 6,631,326 and 6,678,615. Other patents pending. For info: info@floodsource.com.



5728 N Harding Dr
Sales Price
GLA          4,884
Total Rooms   12
Total Bedrms   4
Total Bathrms  4.5
Location      B;Res;
View          B;Mtn;
Site          1.14 ac
Quality       Q3
Age           44

**Subject Rear**



**Subject Street**





**Kitchen**



**Bathroom**



**Master Bathroom**



**Bathroom**







**View from rooftop deck**



**Swimming Pool**



**Lower south end of site**



7015 N Hillside Dr

| | |
|---|---|
| Proximity | 1.69 miles NE |
| Sale Price | 1,300,000 |
| GLA | 4,364 |
| Total Rooms | 12 |
| Total Bedrms | 5 |
| Total Bathrms | 3.5 |
| Location | B;Res; |
| View | B;Panoramic Cbk.M |
| Site | 42,253 sf |
| Quality | Q3 |
| Age | 46 |



### Comparable 2

3270 E Palo Verde Dr

| | |
|---|---|
| Proximity | 0.35 miles NW |
| Sale Price | 1,450,000 |
| GLA | 7,749 |
| Total Rooms | 14 |
| Total Bedrms | 4 |
| Total Bathrms | 6.5 |
| Location | B;Res; |
| View | B;Mttop/Traffic; |
| Site | 1.22 ac |
| Quality | Q3 |
| Age | 33 |



### Comparable 3

4761 E Marston Dr

| | |
|---|---|
| Proximity | 1.64 miles E |
| Sale Price | 1,575,000 |
| GLA | 5,333 |
| Total Rooms | 12 |
| Total Bedrms | 4 |
| Total Bathrms | 3.5 |
| Location | B;Res; |
| View | B;Camelback/Trfc.; |
| Site | 37,026 sf |
| Quality | Q3 |
| Age | 32 |

7/31/14 07:48:24    Desc



6300 N 42nd St
| | |
|---|---|
| Proximity | 1.08 miles NE |
| Sale Price | 1,400,000 |
| GLA | 5,996 |
| Total Rooms | 14 |
| Total Bedrms | 5 |
| Total Bathrms | 4.0 |
| Location | B;Res; |
| View | B;Mtn; |
| Site | 43,124 sf |
| Quality | Q2 |
| Age | 27 |
| | Internet photo |
| | Gated project |



## Comparable 5

3700 E Camino Sin Nombre
| | |
|---|---|
| Proximity | 0.29 miles E |
| Sale Price | 1,300,000 |
| GLA | 4,103 |
| Total Rooms | 11 |
| Total Bedrms | 3 |
| Total Bathrms | 3.0 |
| Location | B;Res; |
| View | B;Mtn; |
| Site | 1.72 ac |
| Quality | Q3 |
| Age | 38 |
| | Internet photo |
| | This photo is more |
| accurate than | the photo taken |
| by the | appraiser. |

## Comparable 6

Proximity
Sale Price
GLA
Total Rooms
Total Bedrms
Total Bathrms
Location
View
Site
Quality
Age

it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 104 | 67 | 82 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | 17.33 | 22.33 | 27.33 | ☒ Increasing | ☐ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 178 | 211 | 169 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 10.3 | 9.4 | 6.2 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | 1,413,793 | 1,353,000 | 1,473,750 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 103 | 83 | 115 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Comparable List Price | 1,749,750 | 1,800,000 | 1,799,999 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | 221 | 169 | 142 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 95 | 94 | 94 | ☐ Increasing | ☒ Stable | ☐ Increasing |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☐ Yes ☒ No | | | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).    Seller concessions are becoming rare. Inventory shows a decline while median sales and list prices remain relatively stable. Median DOM for sales shows a negligible increase while DOM for listings is declining.

Are foreclosure sales (REO sales) a factor in the market?   ☒ Yes   ☐ No   If yes, explain (including the trends in listings and sales of foreclosed properties).
REO's remain a very small factor in this market segment. Any remaining inventory is declining.

Cite data sources for above information.    MLS

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
Most factors are showing a stable market. Due to these statistics, no time adjustments are considered necessary.

If the subject is a unit in a condominium or cooperative project, complete the following:    Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?   ☐ Yes   ☐ No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

Signature                                Signature

# STATE OF ARIZONA

# BOARD OF APPRAISAL

## BE IT KNOWN THAT

## JOHN T. CALLAN

## HAS MET ALL THE REQUIREMENTS AS A

## Certified General Real Estate Appraiser

In accordance with Arizona Revised Statutes and on authority of the Board of Appraisal, State of Arizona.

This registration shall remain evidence thereof unless or until the same is suspended, revoked or expires in accordance with provisions of law.

In witness whereof the Arizona Board of Appraisal caused to be signed by the Chair of the Board.

Chair, Board of Appraisal     7-26-2012

Date

CERTIFICATE NUMBER
**30352**

EXPIRATION DATE
**August 31, 2014**

SHALL REMAIN PROPERTY OF ARIZONA BOARD OF APPRAISAL

155